**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **PATRICIA L. DANKO,** ) | **CASE NO. 5:14CV950** |
| ) | |
| **Plaintiff,** ) | **JUDGE DONALD NUGENT** |
| ) | |
| v. ) | **Magistrate Judge George J. Limbert** |
| ) | |
| **CAROLYN W. COLVIN[1],** ) | **REPORT AND RECOMMENDATION** |
| **ACTING COMMISSIONER OF** ) | **OF MAGISTRATE JUDGE** |
| **SOCIAL SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

Patricia L. Danko ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB") . ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court AFFIRM the Administrative Law Judge's ("ALJ") decision and dismiss Plaintiff's case in its entirety with prejudice.

**I.     PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for DIB in October of 2010 alleging disability beginning September 16, 2010 due to chronic pulmonary obstructive disorder ("COPD") emphysema.  ECF Dkt. #13 ("Tr.") at 121-127, 162.  The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 65-98.  Plaintiff requested an administrative hearing, and on August 28, 2012, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 29-64, 100. On September 14, 2012, the ALJ issued a Decision denying benefits. Tr. at 12-20. Plaintiff requested that the Appeals Council review the ALJ's Decision, and on March 4, 2014, the Appeals Council denied review.  Tr. at 5-11.

On May 2, 2014, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On August 6, 2014, Plaintiff filed a brief on the merits.  ECF Dkt. #14. On October 6, 2014,

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

Defendant filed a brief on the merits. ECF Dkt. #16. A reply brief was filed on October 17, 2014. ECF Dkt. #17.

## II. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from degenerative disc disease ("DDD") and osteoarthritis of the lumbosacral spine, per MRIs on February 23, 2011 and October 3, 2011; moderate thoracolumbar dextroconvex scoliosis, per MRI on February 23, 2011; DDD and osteoarthritis of the cervical spine; and COPD and asthma with a strong and continuing history of tobacco abuse, which qualified as severe impairments under 20 C.F.R. §404.1520(c). Tr. at 14. The ALJ further determined that Plaintiff suffered from a remote history of alcohol and cocaine dependence, gastroesophageal disorder, status post-hysterectomy, hypertension, and very mild depressive disorder, which qualified as non-severe impairments. *Id*. The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and 20 C.F.R §§ 404.1520(d), 404.1525 and 404.1526 ("Listings"). *Id.* at 15.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except that: she could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; she could occasionally stoop, kneel, crouch, and crawl; she needed to avoid concentrated exposure to respiratory irritants, such as fumes, odors, dusts, gases, poor ventilation, etc.; and she could not work around dangerous moving machinery or at unprotected heights. Tr. at 15.

The ALJ ultimately concluded that Plaintiff could perform her past relevant work as a cashier and a waitress and thus the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

-2-

>   2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));
>
>   3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));
>
>   4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));
>
>   5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the

record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V. MEDICAL AND TESTIMONIAL EVIDENCE

Since Plaintiff confines her assertions of error to the ALJ's residual functional capacity ("RFC") determination concerning her lumbar and leg impairments and use of an ambulatory assistive device, the undersigned confines the medical history review to the evidence relevant to these impairments and devices.

### A. Medical history

On March 25, 2010, Plaintiff presented to Dr. Keith complaining of abdominal, trapezius, and back pain. Tr. at 224. She described the pain as moderate and dull and rated it a 6 out of 10. *Id*. She also noted that her sleep was disturbed as a result. *Id*. Dr. Keith found no weakness or edema and he diagnosed neck pain, COPD and back pain, prescribed Ultram, and recommended stretching exercises. *Id*.

Despite other visits with Dr. Keith on April 8, 2010, May 20, 2010, August 25, 2010 and September 24, 2010, it was not until October 14, 2010 when Plaintiff presented to Dr. Keith and again complained about low back pain. Tr. at 219, 237. She related that she had sharp pains in her lower back for the last one and one-half weeks and rated the severity at 8 out of 10. *Id*. Dr. Keith noted her additional symptoms of range of movement limitations, weakness, edema, sleep disturbance and left leg numbness. *Id*. He diagnosed low back pain/sciatica, prescribed Prednisone and Vicodin, and recommended stretching exercises and moist heat. *Id*. Plaintiff again presented to Dr. Keith for her low back pain in January of 2011. *Id*. at 236. He prescribed Neurontin. *Id.*

On February 17, 2011, Plaintiff presented to Dr. Ross, a pain management specialist, for her back, leg and knee pain. Tr. at 262. Plaintiff reported pain since 1995 after she was in a motor vehicle accident. *Id*. She described the pain as constant and rated it as a 8 of 10 at its best and a 10

of 10 at its worst, with a current pain rating at 8. *Id.* She reported that bending and standing and sitting for a long time made the pain worse, and medications, moist heat and stretches made it better. *Id.* Upon examination, Dr. Ross noted that Plaintiff's cervical spine showed palpation tenderness in the paravertebral muscles and tenderness in the trapezium, left greater than right, with diminished flexion and extension range of motion. *Id.* He further noted palpation tenderness and spasms in Plaintiff's paravertebral muscles of her lumbar spine, with facet loading at L4 and L5 and decreased range of motion. *Id.* at 262-263. He found sacroiliac joint tenderness on the right and positive on the left, but much more tender on the left. *Id.* Straight leg raising was positive on the left and Plaintiff had an antalgic gait favoring her left leg. *Id.* at 263. He assessed lumbar DDD, displaced cervical disc without myelopathy, sacrum disorders, osteoarthritis of the lumbar spine, asthma, COPD and reflux esophagitis. *Id.* He noted that Plaintiff already had participated in physical therapy with no relief and a MRI was scheduled to determine where injections would be of the most help to her. *Id.* She was started on Celebrex, Ultram, and Neurontin. *Id.*

On February 23, 2011, Plaintiff's underwent a lumbar spine MRI which showed moderate thoracolumbar dextroconvex scoliosis, no subluxation, and mild disc degeneration at L4-L5 with mild disc bulging, but no significant degree of spinal stenosis and no herniated nucleus pulposus or nerve root compression. Tr. at 265.

On March 3, 2011, Plaintiff presented to Dr. Ross for her back, leg and knee pain. Tr. at 259. He made the same examination findings that he made in February of 2011, identifying palpation tenderness in the paravertebral muscles and tenderness in the trapezium left greater than right, with diminished flexion and extension range of motion. *Id.* He also noted palpation tenderness and spasms in Plaintiff's paravertebral muscles of her lumbar spine, with facet loading at L4 and L5 and decreased range of motion. *Id.* at 259-260. He found sacroiliac joint tenderness on the right and positive on the left, but much more tender on the left. *Id.* Straight leg raising was positive on the left and Plaintiff had an antalgic gait favoring her left leg. *Id.* at 260. He noted diminished sensation at L4 and L5 and diminished strength in the left leg and impaired coordination. *Id.* He assessed lumbar DDD, displaced cervical disc without myelopathy, sacrum disorders,

-5-

osteoarthritis of the lumbar spine, asthma, COPD and reflux esophagitis. *Id.* Plaintiff's Celebrex, Ultram, and Neurontin were refilled and Dr. Ross. scheduled a series of injections. *Id.*

On March 24, 2011, Plaintiff presented to Dr. Lababidi, D.O., a pain management specialist at the same pain management clinic as Dr. Ross, for her lower back, leg and knee pain. Tr. at 256. He outlined Plaintiff's pain since 1995 after a motor vehicle accident and her description of the pain as constant and her rating of pain as 8 of 10 at its best and a 10 of 10 at its worst. *Id.* Upon examination, Dr. Lababidi made the same findings as Dr. Ross of cervical spine showed palpation tenderness in the paravertebral muscles and tenderness in the trapezium left greater than right, with diminished flexion and extension range of motion. *Id.* He further noted palpation tenderness and spasms in Plaintiff's paravertebral muscles of her lumbar spine, with facet loading at L4 and L5 and decreased range of motion. *Id.* at 256-257. He found sacroiliac joint tenderness on the right and positive on the left, but much more tender on the left. *Id.* Straight leg raising was positive on the left and Plaintiff had an antalgic gait favoring her left leg. *Id.* at 257. He assessed lumbar DDD, displaced cervical disc without myelopathy, sacrum disorders, osteoarthritis of the lumbar spine, asthma, COPD and reflux esophagitis. *Id.* Plaintiff's Celebrex, Ultram, and Neurontin were refilled and a series of left sacroiliac injections was scheduled. *Id.* Plaintiff reported that she had fallen four times in the last eight days. *Id.* at 256.

On March 31, 2011, Plaintiff presented to Dr. Fouad, another doctor at the same pain management clinic as Drs. Ross and Lababidi, for her left joint sacroiliac pain. Tr. at 253. He reviewed her MRI and recommended a series of injections in the sacroiliac joint. *Id.* He refilled her Celebrex, Ultram and Neurontin and gave her the first of her injections. *Id.*

On April 21, 2011, Plaintiff presented to Dr. Lababidi for her complaints of back, leg and knee pain. Tr. at 250. Plaintiff reported that she had the pain since 1995 after she was in a motor vehicle accident. *Id.* He assessed lumbar DDD, displaced cervical disc without myelopathy, sacrum disorders, osteoarthritis of the lumbar spine, asthma, COPD and reflux esophagitis. *Id.* Plaintiff received Ultram and a series of left sacroiiliac injections was recommended. *Id.*

-6-

On May 9, 2011, Plaintiff presented to Dr. Lababidi for an injection in her left sacroiliac joint. Tr. at 248-249. Dr. Lababidi diagnosed lumbar DDD, disorders of the sacrum, displaced cervical disc without myelopathy, osteoarthritis, asthma, COPD and reflux esophagitis. *Id*.

On May 19, 2011, Plaintiff presented to Dr. Ross for follow up and reported her pain as a 10 out of 10. Tr. at 297. He refilled her prescriptions and he noted that Plaintiff had greater than 50% improvement from her sacroiliac joint injections and wanted to be set up for radiofrequency ablation ("RFA") on the left side. *Id*. at 298. He also increased her Ultram to six times per day and indicated that Plaintiff would need to be off of work for the next month until her treatments were completed due to her severe pain. *Id*.

On June 13, 2011, Plaintiff presented to Dr. Lababidi for a RFA on the left side of her sacroiliac joint. Tr. at 284.

On June 23, 2011, Plaintiff presented to Dr. Ross for follow up and complained that she had no relief from the injections and her left leg was giving out. Tr. at 291. Her pain was rated as a 6 out of 10. *Id*. at 314.

On July 18, 2011, Plaintiff presented to Dr. Ross for follow up of her back, leg and knee pain. Tr. at 288. She rated her pain at 8 of 10 and he refilled her prescriptions and referred her to physical therapy for a sacroiliac support belt. *Id*. at 289. She indicated that her pain had not been relieved at all after the treatments. *Id*. He refilled her prescription, added a muscle relaxer, and gave her an injection. *Id*. at 292.

On September 7, 2011, Plaintiff presented to a physical therapist for an evaluation to determine her eligibility for a motorized scooter. Tr. at 267. The therapist noted that Plaintiff had severe lower back pain and lower extremity radiculopathy and had fair to poor strength in her knees, ankles and feet. *Id*. at 268. The therapist also indicated that Plaintiff had no edema, but had numbness in her lateral left thigh and her endurance was low as she could only walk 60 feet before becoming sore. *Id.* at 269. He wrote Dr. Keith a letter indicating that Plaintiff did not qualify for a motorized device based upon criteria for insurance coverage in order to obtain one. *Id*. at 271. He indicated that he knew that she had gait difficulty and would benefit from a wheeled walker or

-7-

a self-propelled wheelchair, even though her level of function did not qualify for a motorized device for community mobility. *Id.*

On September 16, 2011, Plaintiff presented to Dr. Keith for follow up of her radiculopathy. Tr. at 304. His impression was DDD. *Id.*

Upon referral by Dr. Keith, Plaintiff presented to Dr. Taliwal at the Crystal Clinic Orthopaedic Center on September 26, 2011 for evaluation of her increasing back pain going into the left buttock and thigh down to her calf. Tr. at 279. He noted that Plaintiff had undergone injections in July, but had increasing pain over the past months and significant weakness in her left leg. *Id*. Upon examination, Dr. Taliwal noted that Plaintiff was in a wheelchair and was able to stand very briefly with a walker. *Id.* He indicated that she had significant stiffness and pain on lumbar flexion, extension and rotation down the leg with some pain inhibition. *Id*. She had significant pain and weakness in her left knee and foot although he noted that it was an effort-dependent component. *Id.* He did note diminished knee and ankle reflex, downgoing Babinski and negative clonus, with positive straight leg raising on the left, and a positive contralateral straight leg raise from the right causing left leg pain. *Id.*

He reviewed x-rays showing mild listhesis at L3-L4, L4-L5 which he thought may be physiologic and he reviewed the February 23, 2011 MRI which showed mild disc degeneration at L4-L5 with no significant degree of stenosis, herniation or nerve root compression. Tr. at 279-281. He diagnosed left leg radiculopathy and he indicated that Plaintiff's significant left leg pain and weakness was somewhat out of proportion to the testing results. *Id.* He recommended a MRI. *Id*.

On October 3, 2011, Plaintiff underwent a lumbar MRI which showed mild multilevel degenerative disc desiccation with a small L4-L5 disc bulge and a mild bilateral L4-L5 neural foraminal narrowing without significant thecal sac narrowing. Tr. at 286.

On October 17, 2011, Plaintiff presented to Dr. Taliwal, who reviewed her October 3, 2011 MRI results showing evidence of a widely patent spinal canal with no evidence of significant disc herniation or stenosis. Tr. at 284. He noted that Plaintiff had a cane with her and had significant weakness in her left knee and foot emanating from her back pain. *Id*. His impression was left leg radiculopathy with foot drop and he indicated that Plaintiff "does have ongoing left leg sensory and

-8-

motor deficit which I cannot explain on the basis of her relatively benign MRI." *Id*. He recommended that she undergo an EMG/nerve conduction study. *Id.*

On October 24, 2011, Plaintiff presented to Dr. Hayek for EMG/nerve conduction testing. Tr. at 307. Dr. Hayek noted that Plaintiff exhibited multiple pain behaviors throughout his examination and ambulated with a cane held in her left hand with a very slow and deliberate gait. *Id*. He noted that she was unable to heel or toe walk and his inspection of her lumbar spine indicated diffuse paravertebral muscular spasm and positive straight leg raising in both the seated and supine position. *Id*. Manual muscle strength testing was difficult due to Plaintiff's pain behaviors and poor effort. *Id*. He found that Babinski was downgoing bilaterally and peripheral pulses were palpable and intact. *Id*. He noted during the nerve conduction study that Plaintiff refused further testing after the peroneal motor testing and refused the needle examination because she could not tolerate it. *Id.* He assessed muscle weakness and leg paresthesia and noted that it was an incomplete study due to Plaintiff's inability to tolerate the testing. *Id.* He suggested a brain MRI to rule out neurological processes such as multiple sclerosis due to her ongoing pain issues and her left lower limb global weakness. *Id*.

On November 11, 2011, Plaintiff presented to Dr. Keith for left leg pain and numbness and lower back pain over the past year. Tr. at 303. She described the pain a moderately severe and rated it as 7 out of 10. *Id*. She indicated that it was exacerbated by sitting and standing and relieved by lying on the right side. *Id*. His impression was left leg radiculopathy and he referred her to a neurologist. *Id*. He prescribed Tramadol. *Id*.

On January 31, 2012, Plaintiff presented to Dr. Barnett at the Summa Health System Barberton Hospital Pain Management Office at the referral of Dr. Keith. Tr. at 273. Plaintiff complained of low back pain with associated radiculopathy. *Id.* Plaintiff indicated that Dr. Lababidi performed a RFA in April of 2011 and since that time, she had constant, numb, achy and sharp pain in her posterior thigh and calf, as well as marked weakness. *Id*. She reported that the pain worsened with walking and standing and was relieved by staying off of her feet. *Id*. Upon examination, Dr. Barnett noted that Plaintiff had normal lower right extremity strength and a marked diminishment of strength in all distributions on the left. *Id*. at 275. He noted that Plaintiff was barely able to move

-9-

any of the specific areas during testing, but moved all of them slightly. *Id*. He remarked that he was unsure whether it was because of pain or for other reasons. *Id*. Upon neurological examination, Dr. Barnett noted that the bilateral lower extremity coordination and muscle strength reflex exam was deferred at Plaintiff's strongly worded request due to her discomfort. *Id.* He reported that Plaintiff's sensation was intact on the right and completely absent on the left to light touch. *Id*. Straight leg raises were negative on the right and strongly positive on the left for radicular discomfort. *Id.* He diagnosed low back pain and lumbar radiculopathy. *Id*.

On February 17, 2012, Plaintiff presented to Dr. Lynch, a neurologist, for her worsening low back pain with radiation. Tr. at 310. He noted that Plaintiff's lumbar spine MRI did not explain her pain or symptoms unless motion of the spine was causing it, although the orthopedic doctors did not believe so. *Id*. Dr. Lynch further noted that an EMG/nerve conduction study would help to determine if a nerve were pinched, but Plaintiff declined to continue the study and he believed that physical therapy would help, as well as pain management. *Id*. He also suggested that Plaintiff may have developed a pain syndrome/fibromyalgia and counseling or psychiatric care may be beneficial, although Plaintiff told him that she was not depressed. *Id*.

On March 13, 2012, Plaintiff followed up with Dr. Barnett and presented in her wheelchair. Tr. at 329. Plaintiff declined to get out of her wheelchair, describing herself as too weak to get up out of the chair. *Id*. at 330. Upon examination, Dr. Barnett noted that Plaintiff's bilateral lower extremity coordination and muscle strength reflexes were refused by Plaintiff and sensation was intact on the right and absent on the left to light touch. *Id*. Straight leg raises were negative on the right and positive on the left for radicular discomfort. *Id.* The musculoskeletal exam found that Plaintiff had normal lower extremity strength on the right, but diminished in all distributions on the left. *Id*. There was also pain over the left sacroiliac joint. *Id*. at 331. Dr. Barnett diagnosed low back pain, lumbar DDD, lumbar disc bulge and lumbar neuroforaminal stenosis. *Id*. Dr. Barnett was willing to take over low-dose sparingly used medication and he declined Plaintiff's request for Vicodin 5/500 two every six hours, but prescribed her half of the requested dosage. *Id*. He also agreed with Dr. Lynch's order for physical therapy and suggested a single lumbar epidural steroid

-10-

injection to see if there were irritated nerve roots that would decrease in inflammation with the injection. *Id*. at 331-332. Plaintiff agreed to consider this injection. *Id*. at 332.

On April 12, 2012, Plaintiff presented to Dr. Labibidi, who noted that he last saw Plaintiff in July of 2011 and she did not participate in physical therapy as directed at that time because her husband was in physical therapy and they could not afford it. Tr. at 353. She explained that her family doctor then suggested that she go to Barberton Pain Management but she left there because she did not want to follow the treatment plan and only wanted to proceed with physical therapy and chiropractic visits. *Id*. Dr. Labibidi noted that Plaintiff was taking Vicodin 5/500 1-2 tablets 4-5 times per day and was using a wheelchair when out of the house because she was unsteady and unable to bear weight for any length of time on her left foot. *Id*. He indicated that Plaintiff was unable to flex her left foot, and had palpation and muscle spasm in the lumbar region and sacroiliac joint pain in the left side. *Id.* He refilled her Neurontin and Baclofen, started her on Vicodin, scheduled a sacroiliac injection, and ordered a TENS unit. *Id*. at 354.

On April 30, 2012, Plaintiff presented to Dr. Labibidi who gave her an injection in her sacroiliac joint. Tr. at 351.

On May 10, 2012, Plaintiff presented to Dr. Lababidi and reported improvement with the injection and indicated that she did not feel the need for further injections. Tr. at 349. She reported that the TENS unit was helpful and Dr. Lababidi refilled her Vicodin and Flexeril. *Id*. She estimated 65% relief four days after her injection. *Id.* at 348.

In May of 2012, Plaintiff was evaluated for and participated in physical therapy for her lumbar, sacroiliac joint and leg pain. Tr. at 357-365.

On June 1, 2012, Plaintiff presented to Dr. Fouad for follow up and rated her pain as a 9 out of 10. Tr. at 345. She noted that she was participating in physical therapy once per week and she did not see any improvement and it actually made her pain worse. *Id*. Dr. Fouad examined Plaintiff and found that Plaintiff had decreased range of motion in the lumbar spine with palpation tenderness in the paravertebral muscles with midline tenderness. *Id*. He also noted sacroiliac joint tenderness positive on the left and normal sensory and motor strength and an antalgic gait favoring her left leg. *Id.* Dr. Fouad commented that Plaintiff had good results with the series of sacroiliac joint injections

but no improvement with the RFA. *Id*. at 346. He refilled her Vicodin and Flexeril and told her to continue using a TENS unit and to continue in physical therapy, but at twice per week. *Id*.

On June 29, 2012, Plaintiff presented to Yanke Bionics Assessment and Progress upon referral by Dr. Keith for a custom fit orthotic for her lower extremity. Tr. at 367-368.

### **B.     Hearing testimony**

Plaintiff testified that she worked part-time for four months as a cashier at The Cigarette Outlet beginning in June or July of 2011. Tr. at 32. She explained that she stopped working at this job after she had the RFA done because it made her leg give out and she had pain in her lower back and a foot drop. *Id.* at 33. She described a typical day as reading and watching television. *Id.* at 39. She could dress herself, but needed help from her husband getting in and out of the bathtub. *Id*. She testified that her husband cooks, dusts, mops, vacuums and does laundry. *Id*. at 40. She eats in restaurants once a month, does not shop for groceries, and does not attend movies, ballgames, or concerts, and she spends an hour per month on the computer and drives a car three times per month to physical therapy, doctor visits and pain management. *Id*. at 38-41. She testified that she traveled more than fifty miles from her home to Shawnee State Park on July 22, 2012 for her wedding anniversary, which was a four-hour drive and they stayed there for three nights and four days. *Id*. at 41.

Plaintiff testified that her most significant impairment that kept her from working is her low back pain with radiation to the left leg and her medications and memory problems. Tr. at 42. She reported that she takes Vicodin, Flexeril and Neurontin for her pain and the medications helped, but they make her tired and reduce her attention span. *Id*. at 42-43. She explained that she had trouble concentrating and was unable to sit still. *Id*. at 43.

Upon questioning by her attorney, Plaintiff reported that the majority of her pain was in her left sacroiliac joint area through her buttock and down her leg. Tr. at 43. She described the pain as someone with a spiked rod going up and down her leg and buttocks. *Id*. She testified that the medications helped, but did not completely relieve her pain as she still was left with a pain level of 6 on a 10-point scale. *Id.* at 43-44. She also related that sometimes, usually two or three times per week, the medications do not work and she has to lay down on her right side and put her TENS unit

on and lay until the pain subsides, which usually takes from half an hour to an hour and a half. *Id*. at 45. Plaintiff also described the numbness going down her left leg and stated that it is numb all of the time. *Id*. at 46. She reported that taking the pain medications and lying on her right side helps. *Id*. She indicated that she suffers from muscle spasms down her left leg and across her back since her RFA and she believed that something went wrong during the RFA. *Id*. She uses the TENS unit twice per day, she participated in physical and aquatic therapy, and she wore an ankle and foot brace. *Id*. at 46-47. She also underwent epidural injections that helped for three to four days afterward and she used a wheelchair every time she went outside because she could not walk long periods of time. *Id*. at 48.

Plaintiff explained that she chose the date of September 16, 2010 as her disability onset date because that is when she had the RFA done and her doctor released her back to work but when she returned to work, she could not move her leg and fell because her leg would give out. Tr. at 45. Three to five days later, she got a cane and her doctor suggested that she get a wheelchair and gave her a prescription for it. *Id.*

Plaintiff reported that she could sit continuously for ten minutes to half an hour without a break before she would have to stand up for at least a couple of minutes and she could stand long enough to brush her teeth. Tr. at 49. When the ALJ asked whether the doctors had explained to her why she was having all the reported pain but her test results did not show more serious problems, Plaintiff responded that she did not understand it and her physical therapists and Yanke Bionics said that it was nerve damage. *Id*. at 50. She indicated that her doctors never stopped giving her medications or believed that her pain was not real. *Id.* She also indicated that she could not even lift five pounds safely. *Id*.

The ALJ then presented a hypothetical individual to the VE of a person with Plaintiff's background, education and work history who can perform light work, with occasional climbing of ramps and stairs, never climbing ladders, ropes or scaffolds, frequently balancing, occasionally stooping, kneeling, crouching and crawling with the need to avoid concentrated exposure to respiratory irritants such as fumes, odors, dust, gases, poor ventilation, etc., and an inability to work around dangerous moving machinery or at unprotected heights. Tr. at 52. The ALJ asked whether

-13-

such a hypothetical individual could perform Plaintiff's past relevant work as a cashier, waitress or cook, and the VE responded that such a hypothetical individual could perform Plaintiff's past relevant work as a cashier and a waitress. *Id*. The VE also identified the jobs of wire worker, electronics worker, bench assembler and a bench hand. *Id*. at 53.

The ALJ presented a second hypothetical individual with the same attributes as the first hypothetical individual, but added that the individual had to alternate between sitting and standing every 30 minutes with five minutes in the alternate position at the work station before resuming the original position of sitting or standing. Tr. at 54. The VE responded that an individual with this additional limitation could not perform any of Plaintiff's past relevant work, and although some cashier jobs would fall under this sedentary classification, most would be eliminated. *Id*. He further testified that the jobs of wire worker, electronics workers and bench assembler would also be reduced significantly with such a limitation. *Id*. He indicated that the bench hand job would remain, and he identified other jobs such as table worker and final assembler. *Id.*

The ALJ presented a third hypothetical individual with all of the attributes as the first hypothetical individual except that the exertional level of work was not light but sedentary. Tr. at 55. The VE responded that such a hypothetical person could perform Plaintiff's past relevant work, but not as she performed it, and such a person could perform the bench hand, final assembler and table worker jobs. *Id.*

The ALJ presented a fourth hypothetical individual, keeping the limitations of the third hypothetical individual and adding the ability to alternate between sitting and standing every 30 minutes with five minutes in the alternate position at the work station before resuming the original position of sitting or standing. Tr. at 55. The VE responded the hypothetical person could still perform the bench hand, final assembler and table worker positions. *Id*. at 56.

The ALJ presented a fifth hypothetical individual, adding a limitation of the individual being off task twenty percent of the workday. Tr. at 56. The VE testified that such a person could not perform any jobs unless special accommodations were provided. *Id.*

-14-

The ALJ presented a sixth hypothetical individual, adding a limitation of the individual being absent from work three days per month.  Tr. at 56.  The VE responded that such a person could perform no jobs without special accommodations.  *Id.*

Plaintiff's counsel then presented hypothetical individuals to the VE.  Tr. at 59.  The first hypothetical individual included the need to lean on a cane while standing or walking at the workplace.  *Id.*  The VE responded that if the person had to lean on a cane while standing, walking would not be an issue unless the job required walking.  *Id.*  However, the VE indicated that if the job required standing in place, and the person had to lean on a cane or on the work station with one hand, the jobs would be eliminated because she would be unable to use both hands.  *Id.* at 59-60.

As to the use of a wheelchair, the VE testified that its use would not significantly erode the sedentary jobs and would erode some of the light jobs, but it would depend upon the layout of the workplace and other factors such as the types of products and whether vehicles or forklifts were coming through the work area.  Tr. at 60.

## VI.     LAW AND ANALYSIS

Plaintiff asserts that substantial evidence does not support the ALJ's RFC because the RFC failed to include limitations resulting from her lumbar problems and left leg pain and her use of a wheelchair and/or cane.  ECF Dkt. #14 at 7-9.  Plaintiff also contends that the ALJ committed error in relying upon the opinions of non-examining agency physicians because those opinions were rendered without an examination and were based upon only a small part of Plaintiff's file.  *Id.*

In addressing the first assertion of error, Defendant begins by presenting a credibility analysis and concludes that substantial evidence supports the ALJ's discounting of Plaintiff's alleged limitations resulting from her impairments because they were contrary to the objective medical evidence and medical source opinions in the record.  ECF Dkt. #16 at 9-11.  In her reply brief, Plaintiff challenges the use of a credibility analysis, arguing that her assertion of error concerns the ALJ's Step Four RFC finding and not his credibility determination.  ECF Dkt. #17 at 1-4.

The undersigned points out that the ALJ engaged in both a credibility and a RFC analysis in determining Plaintiff's RFC.  He set forth the proper regulations and factors in determining each of these findings.  Tr. at 15.  The ALJ referred to Plaintiff's testimony about her back and left leg

-15-

pain, he explained the methods she used for relieving the pain and the treatments that she had undertaken, and he identified the side effects from the medications that she was taking for pain. *Id.* at 16. He also cited to Plaintiff's testimony that she could not walk without her cane, she uses a wheelchair whenever she leaves home, and she uses a cane at home and fell down prior to getting a foot brace. *Id.* The ALJ then addressed the medical evidence in the file and Plaintiff's daily living activities. *Id.* at 15-19.

The determination of a claimant's credibility factors into the ALJ's RFC and the hypothetical questions that he presents to a VE. SSR 96-8p outlines the determination of RFC and provides that the RFC assessment must include a discussion of why reported symptom-related functional limitations can or cannot be accepted as consistent with the medical and other evidence. SSR 96-8p. It also cites to SSR 96-7p, the Ruling providing guidance as to assessing a claimant's credibility and establishing the two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529 , SSR 96-7p. It provides that in order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.; Stanley v. Sec'y of Health & Human Serv.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the

relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

SSR 96-8p also provides that the RFC assessment must consider and address medical source opinions. SSR 96-8p. Moreover, the ALJ is required to incorporate into his hypothetical individual to the VE only those limitations that he finds credible. *Irvin v. Soc. Sec. Admin.*, 573 Fed. App'x 498, 502 (6th Cir. 2014), citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact")(citing *Hardaway v. Sec'y of Health & Human Servs.*, 923 F.2d 922, 927-928 (6th Cir. 1987)). Thus, determining a claimant's credibility is an important factor in evaluating RFC and in presenting an accurate hypothetical individual to the VE.

The undersigned recommends that the Court find that the ALJ's RFC determination applied the proper law and is supported by substantial evidence. The ALJ obviously considered Plaintiff's credibility concerning her impairments and resulting limitations and found that the medical evidence did not support the severe restrictions to which Plaintiff testified, including her use of a wheelchair and cane. As pointed out by the ALJ, no treating physician or other source endorsed Plaintiff's severe restrictions or the medical necessity for a wheelchair or cane. Tr. at 19. And while Dr. Keith referred Plaintiff to a physical therapy evaluation to determine whether she met the insurance criteria for a motorized scooter, the physical therapist's letter to Dr. Keith indicated that it was Plaintiff who was pursuing a motorized scooter. *Id*. at 271. Further, none of Dr. Keith's treatment records show

-17-

that he ordered a wheelchair or cane for Plaintiff or deemed it medically necessary. *Id*. at 214-238, 293-323, 363-365. And the physical therapist who performed the evaluation found that Plaintiff was not qualified for a motorized device for community mobility based upon criteria for insurance coverage. *Id*. The physical therapist indicated that he knew that Plaintiff had gait difficulty, but she would benefit more from a wheeled walker or at the very most a self-propelled wheelchair. *Id*. Moreover, although the physicians with whom Plaintiff treated acknowledged that Plaintiff presented with a cane or wheelchair, none of them prescribed the devices or rendered opinions as to any resulting functional limitations or whether it was necessary for her to have the cane or wheelchair. *Id*. at 210-268, 272-365. The only mention of the necessity of any ambulatory assistive device was from the physical therapist who evaluated Plaintiff once to determine whether she was eligible under insurance criteria for a motorized scooter and determined that she was not, but would probably benefit from a wheeled walker or self-propelled wheelchair. *Id*. at 271. SSR 96-9p instructs that medical documentation is necessary in order to find that a hand-held assistive device is medically required. SSR 96-9p. The record in the instant case fails to contain such documentation.

The ALJ also reviewed the medical evidence concerning Plaintiff's back impairment and left leg pain. Tr. at 16-19. He cited a February 23, 2011 MRI which showed moderate thoracolumbar dextroconvex scoliosis and mild disc degeneration at L4-5 with mild disc bulging and no significant degree of spinal stenosis and no herniated nucleus pulposus or nerve root compression. *Id*., citing Tr. at 265. He cited to Dr. Taliwal's conclusion that Plaintiff's significant left leg pain and weakness seemed to be somewhat out of proportion to her lumbar x-rays and the February 23, 2011 MRI. *Id.*, citing Tr. at 279. The ALJ further cited to Dr. Taliwal's notation in a subsequent treatment note that Plaintiff has "ongoing left leg sensory and motor deficit which I cannot explain on the basis of her relatively benign MRI." *Id*., citing Tr. at 284. The ALJ noted that Dr. Taliwal's latest conclusion was based upon his interpretation of Plaintiff's MRI lumbar spine dated October 3, 2011, which showed evidence of a widely patent spinal canal with no evidence of any significant disc herniation or stenosis. *Id*. at 284. The ALJ also cited to Plaintiff's conservative treatment of injections, physical therapy and medications. *Id.* at 16-19. The ALJ also relied upon the fact that

no treating source confirmed Plaintiff's allegations of severe limitations, including her use of a wheelchair and cane. *Id*. at 19. He noted that while no doctor stated that she was malingering or found her symptoms to be not real, this was insufficient to establish that a nexus existed between her alleged symptoms and limitations and the objective medical evidence. *Id*.

The ALJ thereafter cited to the RFC assessments of state agency physicians from February and July of 2011 and attributed significant weight to them as consistent with the medical evidence, particularly the relatively benign findings on MRIs and X-rays and Plaintiff's conservative treatment. Tr. at 19. He noted that the state agency physicians limited Plaintiff to light work with climbing, environmental and hazard restrictions. *Id*. The ALJ found Plaintiff more limited than the agency reviewing physicians. Plaintiff contends that the ALJ improperly relied upon the opinions of these agency reviewing physicians as they did not examine Plaintiff and they had reviewed only a small portion of her medical record before rendering their statements. ECF Dkt. #14 at 9-10. However, an ALJ can rely upon the opinions of non-examining agency physicians as they are considered highly qualified experts under the Social Security Regulations and are also experts in Social Security disability evaluations. 20 C.F.R. § 404.1527(e)(2)(i). Moreover, although these physicians' assessments were made before some of the treatment records, the ALJ properly considered and evaluated the later medical evidence, none of which contained opinions or functional limitations, and modified his RFC accordingly.

Plaintiff complains that an ALJ's review of the medical record does not give him the ability to make a RFC finding. ECF Dkt. #17 at 3-4. She infers that the ALJ interpreted raw data in the record in order to come up with his RFC for Plaintiff. *Id*. at 3. She notes that the objective medical evidence that Defendant cites in support of the ALJ's RFC was never reviewed by an opining physician. *Id*. However, it is the ALJ who is charged with determining a claimant's RFC based upon the ALJ's evaluation of the medical and non-medical evidence. *Rudd v. Comm'r of Soc. Sec*., No. 12-6136, 531 Fed. App'x 719, 728 (6th Cir. Sept. 5, 2013), unpublished (rejecting assertion that substantial evidence did not support ALJ's RFC because no physician opined Rudd could perform requirements of light work). And to require an ALJ to base his RFC finding on a physician's opinion "would, in effect, confer upon the treating source the authority to make the

-19-

determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p. Moreover, an ALJ is not required to accept a plaintiff's own testimony regarding her pain. *See Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir. 1987).

Here, the undersigned recommends that the Court find that the ALJ properly reviewed the evidence and applied the correct law in determining Plaintiff's RFC and in crediting the state agency physicians' assessments. The undersigned further recommends that the Court find that substantial evidence supports his RFC, which did not include the severe limitations that Plaintiff testified to or the use of a wheelchair and cane.

## VII. RECOMMENDATION AND CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

DATE: July 23, 2015

                            */s/George J. Limbert*
                            GEORGE J. LIMBERT
                            UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).